1  **CANDIS MITCHELL**
   California Bar No. 242797
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   Telephone: (619) 234-8467
4  Candis_Mitchell@fd.org

5

6  Attorneys for Mr. Jose Raymundo Contreras-Hernandez

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                 **(HONORABLE JOHN A. HOUSTON)**

11 UNITED STATES OF AMERICA,        )    CASE NO.: 07CR3190-JAH
                                    )
12                Plaintiff,        )    DATE: JANUARY 14, 2007
                                    )    TIME: 8:30 A.M.
13 v.                               )
                                    )
14                                  )
   **JOSE RAYMUNDO CONTRERAS-**     )    STATEMENT OF FACTS AND
15 **HERNANDEZ**                    )    MEMORANDUM OF POINTS AND
                                    )    AUTHORITIES IN SUPPORT OF MOTIONS
16                                  )
                  Defendant.
17 _____

18

19                           **I.**

20                  **STATEMENT OF FACTS[1]**

21        On October 27, 2007, Border Patrol Agent M. Noland came into contact with ten people in an area

22 near Corte Madera Ranch, thirteen miles north of the border and nine miles east of the Tecate, California,

23 Port of Entry. After brief questioning to establish that the individuals did not posses permission to legally

24 enter the United States, Mr. Contreras-Hernandez was arrested and transported to the Campo Border Patrol

25 Station for processing.

26

27        1. The following is based primarily upon information supplied through Government discovery.
   Mr. Contreras-Hernandez does not stipulate to its accuracy and reserves the right to challenge it at future
28 proceedings.

                                                        07CR3190-JAH

1  At the station it was discovered that Mr. Contreras-Hernandez had an immigration and criminal

2  history. It is alleged that he was read his <u>Miranda</u> rights and chose to invoke them.

3  On November 27, 2007, an Indictment was handed down charging Mr. Contreras-Hernandez with

4  violating 8 U.S.C. §1326 (a) and (b), deported alien found in the United States who had been removed

5  subsequent to October 28, 2005.

6  These motions follow.

7  **II.**

8  **<u>MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE</u>**

9  Mr. Contreras-Hernandez moves for the production of the following discovery.  This request is not

10  limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in

11  the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  <u>See</u>

12  <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989).

13  To date, ***defense counsel has received only 33  pages of discovery***. Mr. Contreras-Hernandez

14  respectfully requests that the Government be ordered to produce discovery because Mr. Contreras-Hernandez

15  has reason to believe that he has not received all the discoverable material in his case.  For example,

16  Mr. Contreras-Hernandez has received no documentation establishing that he was ever deported.

17  Mr. Contreras-Hernandez **specifically requests production of a copy of the taped proceedings and any**

18  **and all documents memorializing the deportation proceeding allegedly held  and any other**

19  **proceedings that the Government intends to rely upon at trial**.  This request includes discovery of

20  materials known to the Government attorney, as well as discovery of materials which the Government

21  attorney may become aware of through the exercise of due diligence.  <u>See</u> FED. R. CRIM. P. 16.

22  Mr. Contreras-Hernandez additionally requests that the Court order the Government to allow him

23  the opportunity to review his A-file in its entirety.  First, the A-file contains documentation concerning his

24  alleged deportation.  Part of Mr. Contreras-Hernandez defense may be that his underlying deportation was

25  invalid.  The documents in the A-file would help illuminate the validity or futility of such a defense.  For

26  example, A-file documents typically contain biographical information.  Such information is essential to

27  determining whether Mr. Contreras-Hernandez's deportation was invalid.

28  Second, the Government will likely try to show at trial that a government officer searched the A-file

1  and did not find an application by Mr. Contreras-Hernandez for permission to enter the United States.

2  Mr. Contreras-Hernandez anticipates that the Government will attempt to admit a "Certificate of Non-

3  Existence of Record" against him,  arguing that if Mr. Contreras-Hernandez had ever applied for permission

4  to enter the United States, such an application would be found in the A-file and because such an application

5  is not in the A-file, Mr. Contreras-Hernandez must not have applied for permission to enter the United

6  States.

7      Although the certificate might be admissible, the question of the thoroughness of the search

8  conducted by the Government of the A-file  is, and should be, open to cross-examination. United States v.

9  Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation.").   Mr. Contreras-

10  Hernandez should be able to review his A-file in order to see whether any application for lawful admission

11  exists.   Moreover, Mr. Contreras-Hernandez should also be able to verify whether other documents that

12  would ordinarily be in the A-file are "non-existent," or otherwise missing from his A-file.  Mr. Contreras-

13  Hernandez may assert a defense that his application for lawful entry was lost or otherwise misplaced by the

14  Government.  He must be allowed the opportunity to review his A-file and the manner in which it is being

15  maintained by the Government in order to present this defense.

16      In addition, Mr. Contreras-Hernandez moves for the production of the following discovery:

17      1.  **Mr. Contreras-Hernandez's Statements.**  The Government must disclose to Mr. Contreras-

18  Hernandez all copies of any written or recorded statements made by Mr. Contreras-Hernandez; the substance

19  of any statements made by Mr. Contreras-Hernandez which the Government intends to offer in evidence at

20  trial; any response by Mr. Contreras-Hernandez to interrogation; the substance of any oral statements which

21  the Government intends to introduce at trial and any written summaries of Mr. Contreras-Hernandez's oral

22  statements contained in the handwritten notes of the Government agent; any response to any Miranda

23  warnings which may have been given to Mr. Contreras-Hernandez; as well as any other statements attributed

24  to Mr. Contreras-Hernandez. FED. R. CRIM. P. 16(a)(1)(A).  The Advisory Committee Notes and the 1991

25  amendments to Rule 16 make clear that the Government must reveal all Mr. Contreras-Hernandez's

26  statements, whether written or oral, regardless of whether the Government intends to make any use of those

27  statements. **Mr. Contreras-Hernandez specifically requests all audio and videotaped copies of his**

28  **statements and any rough notes taken pertaining to the substance of his statements.**

2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Contreras-Hernandez also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Contreras-Hernandez or any other discoverable material is contained. Such material is discoverable under FED. R. CRIM. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Contreras-Hernandez. <u>See</u> FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and 12(i).

3. **Brady Material**. Mr. Contreras-Hernandez requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Contreras-Hernandez on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

4. **Any Information That May Result in a Lower Sentence Under The Guidelines.** Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating evidence relevant to a possible future determination with respect to sentencing.

5. **Mr. Contreras-Hernandez's Prior Record.** Mr. Contreras-Hernandez requests disclosure of his prior record. FED. R. CRIM. P. 16(a)(1)(B).

6. **Any Proposed 404(b) Evidence.** Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

1    This request includes any "TECS" records as well as any other record(s) of prior border crossings

2    (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as

3    impeachment, or in its rebuttal case.  Although there is nothing intrinsically improper about prior border

4    crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject

5    to 404(b), as they are "other acts" evidence that the government must produce before trial.  United States

6    v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

7        The defendant requests that such notice be given three weeks before trial to give the defense time

8    to adequately investigate and prepare for trial.

9        7.  **Evidence Seized.**  Mr. Contreras-Hernandez requests production of evidence seized as a result

10   of any search, either warrantless or with a warrant.  FED. R. CRIM. P. 16(a)(1)(c).

11       8.  **Request for Preservation of Evidence.**  Mr. Contreras-Hernandez specifically requests the

12   preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

13   custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this

14   case.  This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Contreras-

15   Hernandez's personal effects, and any evidence seized from Mr. Contreras-Hernandez.

16       9.  **Henthorn Material.**  Mr. Contreras-Hernandez requests that the Assistant United States Attorney

17   ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

18   involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419 (1995) (holding

19   that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

20   the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

21   1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

22   conduct examination of records; appropriate Government agency may review files and notify AUSA of

23   contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

24   Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

25       10.  **Tangible Objects.**  Mr. Contreras-Hernandez requests the opportunity to inspect, copy, and test,

26   as necessary, all other documents and tangible objects, including photographs, books, papers, documents,

27   fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

28   Government's case-in-chief, or were obtained from or belong to Mr. Contreras-Hernandez.  FED. R. CRIM.

1  P. 16(a)(1)(c). **Specifically, Mr. Contreras-Hernandez requests copies of the audio tapes of his alleged**

2  **prior deportations or removals.**

3      11.  **Expert Witnesses.**  Mr. Contreras-Hernandez requests the name, qualifications, and a written

4  summary of the testimony of any person that the Government intends to call as an expert witness during its

5  case in chief.  FED. R. CRIM. P. 16(a)(1)(E).  The defense requests the notice of expert testimony be provided

6  at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to

7  this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

8  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any

9  expert.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and

10 must determine, reliability and relevancy of expert testimony and such determinations may require "special

11 briefing or other proceedings").

12      12.  **Evidence of Bias or Motive to Lie.**  Mr. Contreras-Hernandez requests any evidence that any

13 prospective Government witness is biased or prejudiced against Mr. Contreras-Hernandez, or has a motive

14 to falsify or distort his or her testimony.

15      13.  **Impeachment Evidence.**  Mr. Contreras-Hernandez requests any evidence that any prospective

16 Government witness has engaged in any criminal act whether or not resulting in a conviction and whether

17 any witness has made a statement favorable to Mr. Contreras-Hernandez.  See FED. R. EVID. 608, 609 and

18 613; Brady v. Maryland.

19      14.  **Evidence of Criminal Investigation of Any Government Witness.**  Mr. Contreras-Hernandez

20 requests any evidence that any prospective witness is under investigation by federal, state or local authorities

21 for any criminal conduct.

22      15.  **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**

23 Mr. Contreras-Hernandez requests any evidence, including any medical or psychiatric report or evaluation,

24 that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth

25 is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has

26 ever been an alcoholic.

27      16.  **Witness Addresses.**  Mr. Contreras-Hernandez requests the name and last known address of

28 each prospective Government witness.  Mr. Contreras-Hernandez also requests the name and last known

address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Contreras-Hernandez.** Mr. Contreras-Hernandez requests the name of any witness who made an arguably favorable statement concerning Mr. Contreras-Hernandez or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.** Mr. Contreras-Hernandez requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Jencks Act Material.** Mr. Contreras-Hernandez requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Contreras-Hernandez to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963). In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

20. **Giglio Information  & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Contreras-Hernandez requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

21. **Agreements Between the Government and Witnesses.** Mr. Contreras-Hernandez requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the

witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

22. **Informants and Cooperating Witnesses.** Mr. Contreras-Hernandez requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Contreras-Hernandez. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Contreras-Hernandez. Brady v. Maryland, 373 U.S. 83 (1963)

23. **Bias by Informants or Cooperating Witnesses.** Mr. Contreras-Hernandez requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

24. **Scientific and Other Information.** Mr. Contreras-Hernandez requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Rule 16(a)(1)(D).

25. **Residual Request.** Mr. Contreras-Hernandez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Contreras-Hernandez requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

## III.

### THIS COURT SHOULD DISMISS THE INDICTMENT FOR ITS FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE OFFENSE

The indictment charges Mr. Contreras-Hernandez with being a previously-deported alien found in the United States in violation of 8 U.S.C. § 1326. The indictment fails to allege elements necessary to

1  convict Mr. Contreras-Hernandez of the offense: that Mr. Contreras-Hernandez knew he was in the United

2  States, he failed to undergo inspection and admission by an immigration officer at the nearest inspection

3  point, and that he voluntarily entered the United States.  As a consequence, it must be dismissed. See e.g.,

4  Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the

5  immigration law); see also United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001);  United States

6  v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999).   However, because these issues were decided against

7  Mr. Contreras-Hernandez in United States v. Rivera-Sillas,  376 F.3d 887 (9th Cir. 2004), they are not

8  briefed herein, but are raised to preserve them for further appeal. (Mr. Contreras-Hernandez would be happy

9  to submit further briefing on these issues to this Court, if so ordered.).

10        Additionally, Mr. Contreras-Hernandez argues that the indictment must be dismissed because it fails

11  to allege in the indictment, in contravention to United States v. Salazar-Lopez, __ F.3d __, 2007 WL

12  3085906 (9th Cir. Oct. 24, 2007), *both* the dates of a previous felony conviction and of a previous removal

13  from the United States, subsequent to that conviction.  The indictment here is insufficient because it only

14  alleges that Mr. Contreras-Hernandez was removed from the United States subsequent to one unassociated

15  date, October 28, 2005.  It does not specifically provide the date of a previous removal nor the date of any

16  alleged previous felony conviction.  "An indictment's failure to recite an essential element of the charged

17  offense is not a minor or technical flaw . . . but a fatal flaw."  United States v. Du Bo, 186 F.3d 1177, 1179

18  (9th Cir. 1999).  Since the indictment fails to allege all of the necessary elements of the offense, it must be

19  dismissed.

20  **IV.**

21  **THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. CONTRERAS-HERNANDEZ**

22  **A.     The Court Must Suppress Mr. Contreras-Hernandez's Alleged Pre-Miranda Field Statements
23  Because They Were Elicited as the Result of Custodial Interrogation.**

24        The material produced thus far by the government indicates that Agent Noland first confronted and

25  interrogated Mr. Contreras-Hernandez, regarding his immigration status, shortly after 3:00 am in an isolated

26  area north of the International Border.  This entire interrogation proceeded any form of administration of

27  Miranda rights by the agents by approximately four hours.

28        "The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings

to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[2] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave. United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[3]

It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed nor told that he was under arrest, was nonetheless in custody for Miranda purposes. Beraun-Panez held that

---

[2] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere." 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

[3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

1  "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

2  812 F.2d at 580.[4]

3       Here, the criteria for a police-dominated atmosphere as articulated in <u>Kim</u> are clearly met. Regarding

4  the language used by Agent Noland to summon Mr. Contreras-Hernandez, while the report does not state

5  the exact words used in identifying himself as a border patrol agent and to get Mr. Contreras-Hernandez into

6  custody, whatever words used clearly indicated to Mr. Contreras-Hernandez that Agent Noland was a law

7  enforcement officer and that Mr. Contreras-Hernandez was in custody. The facts that Agent Noland was in

8  uniform carrying his gun, and in an isolated area with no means to escape substantiate this factor.

9  Additionally, Agent Noland confronted a pedestrian Mr. Contreras-Hernandez while in an isolated area,

10  enhancing any belief that Mr. Contreras-Hernandez would be unable to leave..

11       Concerning the extent to which Mr. Contreras-Hernandez was confronted with guilt, he was

12  apprehended in an isolated area and immediately interrogated about his immigration status. The physical

13  surrounding of the interrogation was clearly a remote area as evidenced by the report's description the

14  isolated location of Corte Madera Ranch.  The report is devoid of any landmarks such as homes or

15  businesses.  It is, however, unclear how long the detention took place or the amount of pressure applied to

16  Mr. Contreras-Hernandez since Agent Noland's report does not address how long the interrogation and

17  detention took and only uses boiler-plate language to describe Mr. Contreras-Hernandez's responses. Further,

18  the defendant in <u>Kim</u> was isolated from  family, a fact that the Court gave great weight to. <u>Kim</u>, 292 F.3d

19  at 977. Here, Mr. Contreras-Hernandez was in a rural area, as in <u>Beraun-Panez</u>, with an armed border patrol

20  agent in a government vehicle, while he was on foot.. Thus, the statements must be suppressed.

21       Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Contreras-

22  Hernandez was isolated, the agent's questioning bore on Mr. Contreras-Hernandez's alienage, which is an

23  element of the charged offense, 8 U.S.C. § 1326.  <u>See United States v. Meza-Soria</u>, 935 F.2d 166, 171 (9th

24  Cir. 1991).  This question in such a setting carried with it implicit suspicion of criminal activity. A person,

25  such as Mr. Contreras-Hernandez, subjected to such questioning in such a situation obviously does not

26

27

28      [4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area.  <u>Beraun-Panez</u>, 812 F.2d at 580.

1   reasonably feel free to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d

2   719, 725 (9th Cir. 2001).

3          In the context of an encounter between border patrol and an individual near the international border,

4   any questioning regarding an individual's alienage falls under the rubric of custodial interrogation.

5   Furthermore, because of the close relationship between civil and criminal immigration investigations,

6   "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be

7   accompanied by the Miranda warnings."  United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.

8   1983).

9          In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at

10  a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole

11  officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The

12  Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr. Gonzalez-

13  Sandoval where he was born and whether he possessed documents to verify the legality of his presence in

14  the United States.  Id.  The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border

15  Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned

16  Mr. Gonzalez-Sandoval about any alias he possessed.  Id.  The agents ran an INS record check against

17  Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record.

18  Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted

19  statements by Mr. Gonzalez-Sandoval about his name and alias.  Id. at 1047.

20         In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain

21  biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew

22  about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to

23  obtaining the biographical data.  Id. Afterwards, the agent made further inquiries at his office and within

24  three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite

25  the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that

26  the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his

27  interrogation could lead to federal charges against the defendant.  Id. at 1278-1279.

28

1   Here, it is obvious that the information the agent elicited from Mr. Contreras-Hernandez, during the

2   interrogation, regarding his citizenship, application for permission to enter, and use of a document was

3   "reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in

4   fact two of the four elements that they government must prove to obtain a conviction for a violation of 8

5   U.S.C. § 1326. Moreover, it is undisputed that Mr. Contreras-Hernandez was not read his <u>Miranda</u> rights

6   at that point, nor advised that his answers to the agent's questions could result in federal charges against him.

7   Therefore, statements must be suppressed.

8   **B.    Mr. Contreras-Hernandez's Alleged Post-Miranda Statements Must Be Suppressed Because They Were Not Voluntary.**

9

10  Based upon the discovery received from the government, it appears that there were two separate and

11  distinct interrogations of Mr. Contreras-Hernandez after her arrived at the Campo Border Patrol Station.

12  At 3:00 p.m., Mr. Contreras-Hernandez was interviewed by Border Patrol Officer Jacob D. Sanchez. Later,

13  at 6:00 p.m., Mr. Contreras-Hernandez was again interviewed, this time by Border Patrol Agent Sergio

14  Narvaez. At the second of the two interviews, Mr. Contreras-Hernandez requested that the Agent Sergio

15  Narvaez read him his <u>Miranda</u> rights twice, and then he invoked his right to counsel.

16  **1.    First Set of Statements at the Station**

17  **i.    Any Statements Made at 3:00 p.m. Should Be Suppressed as There is No Showing that a Waiver of *Miranda* Rights Occurred, or that Such Waiver was Knowing, Intelligent, or Voluntary**

18

19  Mr. Contreras-Hernandez was in custody at the time of the alleged questioning as he had been

20  deprived of his freedom by the agents. There is no documentation that Mr. Contreras-Hernandez was read

21  his rights at 3:00 p.m., either with video or a signed and time notated waiver. The discovery provided is also

22  unclear whether Mr. Contreras-Hernandezd waived his rights or invoked -- as he did when he is later read

23  his rights at 6:00 p.m. Therefore, the Court should suppress any early statements made by Mr. Contreras-

24  Hernandez.

25  Since Mr. Contreras-Hernandez's initial statements were the product of unwarned custodial

26  interrogation, the Court must suppress any and all fruits of those statements. These fruits include the

27  subsequent warned confession as well as all of the derivative evidence discovered by the government as a

28  result of the knowledge it obtained through the interrogation of Mr. Contreras-Hernandez.

1   When asked to suppress the fruits of unwarned statements obtained during custodial interrogation,

2   the court's "critical inquiry is whether the unwarned statements . . . [were] made voluntarily." United States

3   v. Gonzalez-Sandoval, 894 F.2d 1043, 1048 (9th Cir. 1990); see also United States v. Wauneka, 842 F.2d

4   1083 (9th Cir. 1988) and 18 U.S.C. § 3501(b).    The government must show voluntariness by a

5   preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).  The court must determine

6   voluntariness by a close scrutiny of the totality of the circumstances under which the subject of the custodial

7   interrogation made the statements.   See Miller v. Fenton, 474 U.S. 104, 112 (1985); Schneckloth v.

8   Bustamonte, 412 U.S. 218, 226 (1973).

9   Although one factor that must exist in order to find the subject's statement was not made voluntarily

10  is coercive police conduct, Connelly, 479 U.S. at 167, "[f]ailure to administer *Miranda* warnings [prior to

11  the time the defendant makes statements] creates a presumption of compulsion." Oregon v. Elstad, 470 U.S.

12  298, 307 (1985). In addition, such coercion, or "overreaching," must be "causally related to the [statement]."

13  Connelly, 479 U.S. at 163-64.  Put another way, the statement must be a product, or a result, of the police

14  conduct.  Id. (discussing cases).

15  In a case where the government obtains statements from an individual before the admonishment

16  required by Miranda v. Arizona, 384 U.S. 436 (1966), as well as statements after allegedly warning the

17  individual as Miranda requires, the admissibility of the statements obtained after the Miranda warnings

18  depends on whether the government compelled the statements obtained prior to the administration of the

19  Miranda warnings.  United States v. Wauneka, 842 F.2d 1083, 1086-87 (9th Cir. 1988).

20  Thus, Mr. Contreras-Hernandez moves to suppress all statements, and the fruits thereof, obtained

21  in violation of Miranda.  Moreover, Mr. Contreras-Hernandez challenges any alleged Miranda waiver, as

22  any waiver was not knowing, intelligent, or voluntary. Under prevailing Ninth Circuit law, the government

23  bears the burden of demonstrating a Miranda waiver by clear and convincing evidence.  See Schell v. Witek,

24  218 F.3d 1017 (9th Cir. 2000)(en banc)(constitutional rights may ordinarily be waived only if it can be

25  established by clear and convincing evidence that the waiver is voluntary, knowing, and

26  intelligent.")(citations omitted). Moreover, this Court must "indulge every reasonable presumption against

27  waiver of fundamental constitutional rights."  Id. (citations omitted).

28

1

      **ii.**    **Mr. Contreras-Hernandez's Statements Should Be Suppressed Because They**
              **Were Obtained Outside the Safe-Harbor Period and He Was Not Arraigned**

2

              **Without Unnecessary Delay.**

3
      Mr. Contreras-Hernandez's post-arrest statements must be suppressed because they were taken more

4
than five hours after his arrest and the government failed to arraign him without unnecessary delay as

5
required under Fed. R. Crim. P. 5(a)(1)(A).

6
      Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides that "[a] person making an

7
arrest within the United States must take the defendant without unnecessary delay before a magistrate judge,

8
or before a state or local judicial officer . . . ." Fed. R. Crim. P. 5(a)(1)(A). The "[p]rovisions related to Rule

9
5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest

10
and the ordinary administrative steps required to bring a suspect before the nearest magistrate." Mallory v.

11
United States, 354 U.S. 449, 453 (1957). The police must "arraign the arrested person before a judicial

12
officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause

13
may be promptly determined." Id. at 454. The arrested person may be booked, "[b]ut he is not to be taken

14
to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to

15
eliciting damaging statements to support the arrest and ultimately his guilt." Id.

16
      "If a United States magistrate is not reasonably available under Rule 5(a), the arrested person shall

17
be brought before a state or local judicial officer . . . and such officer shall inform the person of the rights

18
specified in rule 5(c) and shall authorize the release of the arrested person . . ." Fed. R. Crim. P. 5, Advisory

19
Committee Notes, 1972 Amendment. The language of this provision "reflects the view that time is of the

20
essence." See Fed. R. Crim. P. 5, Advisory Committee Notes, 2002 Amendments.

21
      "Legislation such as this requiring that the police must with reasonable promptness show legal cause

22
for detaining arrested persons, constitutes an important safeguard--not only in assuring protection for the

23
innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive

24
and self-confident society." Mallory, 354 U.S. at 452 (quoting McNabb v. United States, 318 U.S. 332, 342-

25
44 (1943)). In order adequately to enforce the requirement of prompt arraignment, it is necessary to render

26
inadmissible incriminating statements elicited from defendants during a period of unlawful detention. Id.

27
at 453.

28

07CR3190-JAH

In <u>Mallory</u>, for example, the Supreme Court found that "the circumstances of [the] case preclude a holding that arraignment was without unnecessary delay." <u>Id.</u> at 455. There, the defendant was arrested in the early afternoon, interrogated for approximately a half-hour, detained for an additional four hours, and interrogated again. <u>Id.</u> The defendant was not arraigned until the next morning. <u>Id.</u> at 451. In finding the statements inadmissible due to the unnecessary delay in arraignment, the Supreme Court emphasized that "[i]t is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate . . . ." <u>Id.</u> at 456.

According to reports provided in discovery, Mr. Contreras-Hernandez was detained on October 27, 2007, around 3:00 a.m. However, he was not interrogated by the agents until 3:00 p.m. Finally, the government waited until October 29, 2007, to arraign Mr. Contreras-Hernandez. As such, he was not taken "without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ." as required by Rule 5. Therefore, Mr. Contreras-Hernandez's statements must be suppressed.

Pursuant to 18 U.S.C. § 3501(c), delay in presentment, beyond six hours, requires suppression of any incriminating statements made thereafter. Section 3501(c) provides:

> In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit person charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been voluntarily made and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention . . .

"The clear meaning of this provision is that delay alone permits suppression when any of these requisites are not met." <u>United States v. Perez</u>, 733 F.2d 1026, 1031 (2d Cir. 1984). Thus, the Ninth Circuit has held that "there must be circumstances in which delay in arraignment will require suppression of a confession regardless of the voluntariness of the confession." <u>United States v. Alvarez-Sanchez</u>, 975 F.2d 1396, 1401 (9th Cir. 1992), <u>overruled on other grounds</u>, 511 U.S. 350 (1994) (holding that the exclusionary rule—due to delay in arraignment—does not apply where the person is detained solely on state charges). <u>See also</u> <u>Perez</u>, 733 F.2d at 1031 ("[§] 3501 leaves the <i>McNabb-Mallory</i> rule intact with regard to confessions obtained after a six hour delay"); <u>United States v. Robinson</u>, 439 F.2d 553, 563-64 (same).

1  Because Mr. Contreras-Hernandez's was not promptly arraigned before a magistrate judge or other

2  state or local official, his statements must be suppressed.

3          iii.     **The Court Should Suppress Mr. Contreras-Hernandez's Recorded Statements
                  as Involuntary.**

4

5          Delay in interrogating a defendant "can provide the sole basis for a finding of involuntariness, if the

6  delay exceeds six hours." United States v. Manuel, 706 F.2d 908, 913 (9th Cir. 1983).  In United States v.

7  Wilson, the Ninth Circuit stated that "the fact that unreasonable delay, alone, beyond six hours may support

8  a finding of involuntariness suggests that unreasonable delay is the most important factor of all [in the 3501

9  analysis]." 838 F.2d 1081, 1085 (9th Cir. 1988).  Wilson further explains "if unreasonable delay in excess

10  of six hours can itself form the basis for a finding of involuntariness, that same delay may also suggest

11  involuntariness of the Miranda waiver." Id. at 1086.  Finally, in Alvarez-Sanchez, 975 F.2d at 1400-01, the

12  Ninth Circuit noted that while delay prior to obtaining a confession may be a basis for finding statements

13  to be involuntary, pre-confession delay (as opposed to pre-arraignment delay) need not be unreasonable to

14  warrant suppression.  Because any statements made by Mr. Contreras-Hernandez's were obtained twelve

15  hours after his detention, this Court should find that any Miranda waiver and subsequent statements were

16  involuntary, and thus, inadmissible.

17  **C.     Mr. Contreras-Hernandez Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The
       Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.**

18

19          This Court should conduct an evidentiary hearing to determine whether any statements made by

20  Mr. Contreras-Hernandez's should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is

21  required to determine, outside the presence of the jury, whether any statements made by Mr. Contreras-

22  Hernandez were voluntarily made. In addition, § 3501(b) requires this Court to consider various enumerated

23  factors, including whether Mr. Contreras-Hernandez understood the nature of the charges against him and

24  whether he understood his rights.

25          Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual

26  determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12.  See United

27  States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as

28  important as the trial itself,'" Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings

1  should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a

2  prosecutor's responsive pleadings.

### V.

### MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel has incomplete discovery at this time, and contemplates further motions once discovery is received and reviewed with Mr. Contreras-Hernandez.  Therefore, counsel requests leave to file additional motions once discovery is completed.

### VI.

### CONCLUSION

For the foregoing reasons, Mr. Contreras-Hernandez respectfully requests that the Court grant the above motions.

Respectfully submitted,

*s/ Candis Mitchell*
**CANDIS MITCHELL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Contreras-Hernandez
Candis_Mitchell@fd.org

Dated: December 18, 2007